IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TRACY L. SHEETS,                          )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        Civil Action No. 13-1842-RGA/MPT
                                          )
CAROLYN W. COLVIN,                        )
Commissioner of Social Security,          )
                                          )
                Defendant.                )


## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

This action arises from the denial of plaintiff Tracy Sheets's ("plaintiff") claim for

Social Security benefits.  On February 9, 2010, plaintiff filed an application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act").  (D.I. 14 at

10.)  In her application and disability report, plaintiff claimed she became disabled

beginning on June 30, 2009, due to neck, knee, and shoulder pain, hand numbness,

and post-traumatic stress disorder ("PTSD").  (*Id.* at 10-11.)  Following the Social

Security Administration's ("SSA") denial of her claim, both initially and upon

reconsideration, plaintiff requested an ALJ hearing.  (*Id.* at 10, 20.)  The hearing

occurred on April 10, 2012.  (*Id.* at 10, 21.)  At the hearing, testimony was provided by

plaintiff and an impartial vocational expert, Ellen Jenkins ("Jenkins").  (*Id.* at 21-59.)  On

May 3, 2012, the ALJ, Judith A. Showalter, issued a written decision denying plaintiff's

benefits claim.  (*Id.* at 7-20.)  Plaintiff requested a review of the ALJ's decision by the

Social Security Appeals Council, which was denied on September 11, 2013.  (*Id.* at 1-

6.)  On November 3, 2013, plaintiff filed a timely appeal with the court.  (D.I. 2.)

Presently before the court are the parties' cross-motions for summary judgment.  (D.I.

23; D.I. 27.)  For the reasons that follow, the court will grant and deny in part plaintiff's

motion for summary judgment, and grant and deny in part defendant's motion for

summary judgment.

## II.    BACKGROUND

Plaintiff was born on December 23, 1965.  (D.I. 14 at 28.)  She has a high school

education, and attended some college.  (*Id.* at 10.)  Her alleged disability dates from

June 30, 2009.  (*Id.*)  Plaintiff's underlying injury occurred in 2007, when she sustained

neck injuries in a motorcycle accident.[1]  (*Id.* at 15.)  After the accident, she continued to

work full-time until February 2009, and then part-time until 2011.  (*Id.*)  Plaintiff has not

worked since 2011.  (*Id.* at 34.)  Despite her prior vocational experience, plaintiff claims

she remains disabled under the Act.  (*Id.* at 21-54.)  To be eligible for DIB, plaintiff must

demonstrate she is disabled within the meaning of §§ 216(I) and 223(d) of the Act.  (*Id.*

at 10.)

### A.    Evidence Presented

Plaintiff began experiencing severe neck pain after an accident on June 1, 2007,

in which she was thrown off her motorcycle after going into a ditch.[2]  (*Id.* at 273, 433.)

This pain, described as "go[ing] down between the shoulder blades[,]" did not radiate

into the arms.  (*Id.* at 433.)  On November 20, 2008, plaintiff underwent an MRI of the

---

[1] Plaintiff alleges her PTSD is the result of childhood abuse.  (*Id.* at 13, 39.)
[2] Plaintiff stated her neck pain began in September 2005, as the result of moving furniture.  (*Id.* at 433.)  That pain was manageable until the motorcycle accident.  (*Id.*)

cervical spine at St. Francis Hospital, which revealed a large wide-based disc herniation at C5-C6 with minimal cord impingement, and also a small disc herniation at C6-C7. (*Id.* at 267). An evaluation at Delaware Neurosurgical Group ("DNG") on January 14, 2009 revealed neck discomfort on turning. (*Id.* at 433.) Plaintiff stated during the evaluation that neither physical therapy ("PT") nor pain medication provided "significant relief." (*Id.* at 434.) Accordingly, she desired surgical treatment, and on February 9, 2009, underwent anterior cervical decompression with discectomy and arthroplasty using an artificial disc at C5-C6 ("surgery"). (*Id.* at 434, 444-46.)

Plaintiff reported a reduction in pain following the surgery. (*Id.* at 430-31.) She did, however, continue to experience some pain, especially late in the day. (*Id.*) At a follow-up visit to DNG on March 10, 2009, plaintiff advised she had not returned to work as a certified nursing assistant. (*Id.* at 431). At another follow-up visit to DNG on April 21, 2009, she mentioned her pain was worse "after working a full day."[3] (*Id.* at 430.) Her daily pain medications included Naproxen, Lortab, and Flexeril. (*Id.* at 404, 430.) On March 23, 2009, plaintiff began PT at Christiana Care, which concluded on June 9, 2009. (*Id.* at 404-17.) According to the records from Christiana Care, PT was successful, as all therapy goals were met. (*Id.* at 404, 416.)

On June 22, 2009, plaintiff's primary care physician, Dr. Jose Castro ("Dr. Castro"), referred her to Dr. Frank Falco ("Dr. Falco"). (*Id.* at 454.) Plaintiff told Dr. Falco she suffered from chronic neck and back pain, with an intensity of 7/10,

_____

[3] On March 23, 2009, plaintiff advised she recently started part-time employment at Kohl's, working two to five hours three days per week or about 10 hours per week. (*Id.* at 404.)

regardless of pain medication.  (*Id.*)  She further advised there was 50% pain relief

since the surgery.  (*Id.*)  After administering the Dallas Pain Questionnaire, Dr. Falco

reported plaintiff had a "severe impairment with mood disturbance, depression, and

anxiety."  (*Id.*)  He diagnosed postlaminectomy syndrome of cervical region, neck pain,

degeneration of lumbosacral intervertebral disc, chronic pain syndrome, mood disorder

NOS, opioid dependence, and depression with anxiety.  (*Id.* at 457.)  Dr. Falco

recommended a cervical spine MRI to determine the current condition of her neck.  (*Id.*

at 454, 457.)

On June 30, 2009, plaintiff returned to DNG for another follow-up visit.  (*Id.* at

429.)  She complained of pain "in the trapezius and down the thoracic spine."  (*Id.*)  She

claimed the PT provided no improvement, and the pain was now worse in the morning,

and increased with lifting.  (*Id.*)  Plaintiff advised of the examination by Dr. Falco and the

upcoming MRI.[4]  (*Id.*)  Plaintiff reported taking multiple pain medications, and not

working.  (*Id.*)

On July 6, 2009, plaintiff returned to Dr. Falco, who prescribed several pain

medications, including Naproxen, Norco,[5] and Zanaflex.  (D.I. 14 at 458-59.)  On August

13, 2009, Dr. Falco performed posterior cervical facet joint nerve blocks ("nerve

blocks").  (*Id.* at 462-63.)  At a follow-up visit with Dr. Falco on September 14, 2009,

plaintiff related the nerve blocks provided 100% pain relief for six hours, but no relief

---

[4] The MRI was performed on July 2, 2009.  (*Id.* at 429, 458.)  The MRI findings
were "limited due to metal artifact."  (*Id.* at 458.)

[5] Norco and Lortab are the same medication, a combination of the painkiller,
Acetaminophen, and the opioid, Hydrocodone.  *Wilkinson v. Astrue*, 10–CV–2376, 2012
WL 1580993, at *5 n.25 (M.D. Pa. May 4, 2012).

thereafter. (*Id.* at 464.) She also stated her pain medication was "working well." (*Id.*) On October 29, 2009, plaintiff underwent additional nerve blocks from Dr. Falco, and he scheduled her for a C4-C7 PE radiofrequency ablation ("RF ablation"), which was performed on November 25, 2009. (*Id.* at 468-69, 471, 473.)

After her health insurance coverage expired in November 2009 and Dr. Falco subsequently discontinued his care, plaintiff did not seek further medical treatment until February 1, 2010, when she saw Dr. Castro. (*Id.* at 283-84.) Plaintiff advised of experiencing severe pain since the RF ablation, and having no prescribed pain medications. (*Id.* at 283.) She advised she obtained pain medications from her sister. (*Id.*) Dr. Castro prescribed Naproxen, Neurontin,[6] Norco, and Zanaflex. (*Id.*) At this time, Dr. Castro reported plaintiff was working part-time at Kohl's. (*Id.*)

On March 1, 2010, plaintiff complained of depression to Dr. Castro, and was prescribed Lexapro as a result. (*Id.* at 284, 546.) Beginning with this visit, Dr. Castro's records listed plaintiff as "unemployed."[7] (*Id.* at 284-88, 290-91, 390-95.) On April 1, 2010, plaintiff informed Dr. Castro that she felt her "nerves [were] on edge" and she tended to "fl[y] off the handle." (*Id.* at 285.) She also told Dr. Castro of previously receiving four steroid injections, which provided no pain relief. (*Id.*) Dr. Castro diagnosed anxiety state unspecified, and advised her to see a psychiatrist.[8] (*Id.*)

_____

[6] Plaintiff claimed this medication "cloud[ed] her sensorium" and impaired her ability to concentrate. (*Id.* at 284, 546.)

[7] Dr. Castro's report on November 15, 2010 listed plaintiff as unemployed, but noted she was recently hired by the University of Delaware as a school bus driver. (*Id.* at 393.) His subsequent reports, however, listed plaintiff as unemployed, with no mention of the bus driver job. (*Id.* at 394-95.)

[8] It is not clear whether the Neurontin contributed to her depression and anxiety. (*Id.* at 546.)

On May 7, 2010, Dr. Castro referred plaintiff to Grossinger Neuropain Specialists ("GNS").  (*Id.* at 271-72.)  Plaintiff related to GNS that she had muscle spasms, which were helped by Zanaflex, which caused tiredness.  (*Id.* at 271.)  GNS diagnosed chronic cervical and thoracic strain with myofascial pain, and possible fibromyalgia.  (*Id.* at 272.)  Mobic was prescribed in place of Naproxen, along with Diazepam, a muscle relaxant.  (*Id.*)

On July 16, 2010, plaintiff began PT at Pro Physical Therapy.  (*Id.* at 292.)  The physical therapist reported her condition was "consistent with posterior disc derangement[,]" and "significant cervical [and] scapular weakness and scapular dyskinesia."  (*Id.*)  Plaintiff advised pain was worst in the morning,[9] and exacerbated by sitting, lying on her side, and lifting.  (*Id.*)  During visits to Dr. Castro between September 9, 2010 and November 8, 2010, plaintiff complained of constant neck pain, numbness in the arms, shoulder pain, stiffness in the right shoulder, and pain in both knees.  (*Id.* at 390-92.)  Her knee pain began in mid-2009.  (*See id.* at 568, 597.)

On November 5, 2010, at a follow-up visit with GNS, plaintiff claimed Zanaflex was ineffective.  (*Id.* at 315.)  GNS diagnosed trigger points in the lower cervical paravertebral and upper thoracic paravertebral region, and administered lidocaine injections at those trigger points.  (*Id.*)  On November 22, 2010, plaintiff began PT for her knees at Dynamic Physical Therapy.  (*Id.* at 568-98.)  After completion of this PT on January 31, 2011, plaintiff claimed her knee pain was reduced by 50%, but she still experienced pain climbing and descending steps, mainly late in the day.  (*Id.* at 597.)

---

[9] Previously, her pain was worst late in the day.  (*Id.* at 430-31.)

On January 24, 2011, plaintiff returned to GNS, and more trigger points were located in her lower cervical paravertebral and upper thoracic paravertebral region. (*Id.* at 507.) During this visit, Hydromorphone in place of Norco,[10] and a long-acting analgesic, Kadian, were prescribed. (D.I. 14 at 507.)

On July 7, 2011, plaintiff returned to GNS. (*Id.* at 505.) She reported working two hours per day as a bus driver for the University of Delaware. (*Id.*) Plaintiff, however, could not tolerate the job due to pain, which caused her to be "emotionally drained." (*Id.*) She further advised the pain was unchanged since her last visit, and the intensity of her cervical spine pain ranged between 6/10 and 8/10. (*Id.*) GNS observed tenderness on palpation in the cervical spine, cervical paraspinous muscles, right subscapular area, lumbar spine, and lumbar paraspinal facet areas, as well as decreased range of motion in the cervical area and lumbar spine. (*Id.*) Plaintiff agreed to undergo cervical facet injections from C4 to C7 every other week at GNS, and received initial injections on August 4, 2011. (*Id.* at 496-97, 505.) Upon returning for the second cervical facet injections on August 18, 2011, she advised the first round provided no relief. (*Id.* at 489-90, 492.) The second set of injections were administered as scheduled. (*Id.* at 489-90.) During a visit to Dr. Castro on October 24, 2011, plaintiff claimed the injections increased her pain. (*Id.* at 555.) Dr. Castro's record for this visit listed plaintiff as unemployed. (*Id.*)

On November 10, 2011, plaintiff returned to GNS, complaining of "central neck

_____

[10] The GNS report refers to plaintiff's previous medication as Vicodin, rather than Norco. (*Id.*) Vicodin is the same medication as Norco. *See supra* note 5; *Wilkinson*, 2012 WL 1580993, at *5 n.25.

pain with radiation into the shoulders and arms and down into the thoracic region with numbness and tingling." (*Id.* at 487.) Upon examination, "spasm and tenderness in her cervical region" and scarring from the 2009 surgery were noted. (*Id.*) GNS diagnosed failed surgical neck syndrome status post a C5-C6 disc replacement and cervical facet syndrome. (*Id.*) Her medications included Diazepam, Kadian, Hydromorphone, and Zanaflex. (*Id.*) Plaintiff was also using a TENS unit and massage.[11] (*Id.*) She was prescribed Lyrica in addition to the other medications, and was scheduled for a consultation for placement of a temporary spinal cord stimulator. (*Id.*) GNS determined her disability precluded gainful employment, and noted she was applying for social security disability. (*Id.*)

On February 2, 2012, plaintiff returned to Dynamic Physical Therapy for PT of her shoulders. (*Id.* at 639.) She was unable to reach above shoulder level, which required dressing with assistance. (*Id.*) She also complained of numbness in the upper extremities, mainly at night when lying on her side. (*Id.*) Most measurements initially taken for shoulder and joint movement were below normal range. (*Id.* at 639-40.) On February 21, 2012, plaintiff underwent an EMG at GNS, which revealed moderate bilateral C6 radiculopathy. (*Id.* at 676-77.) In its report to Dr. Castro, GNS explained the radiculopathy "correlates with her focal neurological deficits." (*Id.*) GNS also stated plaintiff was "totally and permanently disabled from gainful employment." (*Id.* at 677.)

On February 21, 2012, GNS completed a Physical Residual Functional Capacity

---

[11] TENS stands for "transcutaneous electrical nerve stimulation." *Sims v. Astrue*, 10–CV–1943, 2011 WL 4458789, at *4 n.12 (M.D. Pa. Sept. 23, 2011). A TENS unit "is a battery powered device used to send electrical impulses to certain parts of the body to block pain signals." *Id.*

Questionnaire ("questionnaire") on plaintiff.  (*Id.* at 683-88.)  The questionnaire reported her pain intensity as 8/10, and her impairments were expected to last 12 or more months and were consistent with her symptoms and limitations, with no evidence of malingering.  (*Id.* at 683-84.)  GNS concluded plaintiff was "capable of low stress jobs" based on her symptoms and limitations,[12] and due to her impairments, she would, on average, miss more than four days of work per month.  (*Id.* at 684-87.)

B.    **Hearing Testimony**

1.    **Plaintiff's Testimony**

At the April 10, 2012 hearing, plaintiff testified about her background, injury, pain, and treatments.  (*Id.* at 21, 27-54.)  She is divorced, has no children under 18 living with her, has a high school diploma, is able to read, write, and do simple math, and has a commercial driver's license.  (*Id.* at 28-29.)  Her past employment included jobs as a school bus driver, tag scanner, certified nursing assistant, auditor, customer service operator, payment collector, and sign language interpreter.  (*Id.* at 30-33.)  Except for the certified nursing assistant position, none of the jobs required heavy lifting.  (*Id.*)  The tag scanner job required standing; the auditor work required both sitting and standing; and the customer service operator, payment collector, and sign language interpreter positions required mostly sitting.  (*Id.*)

She stopped working on June 30, 2009 as a tag scanner because it required

---

[12] Her limitations included sitting and standing for 15 minutes at a time; lifting no more than 10 pounds; no stooping, bending, crouching, squatting, or climbing; and major difficulty in reaching, handling, or fingering.  (*Id.* at 684-86.)

working consecutive days, which was too painful.[13]  (*Id.* at 34.)  She currently receives financial assistance from her family, as well as a $125 monthly pension from her former husband.[14]  (*Id.* at 35.)  Plaintiff filed for Social Security disability in February 2010 because she was unable to maintain employment despite multiple attempts to do so.  (*Id.* at 35-36.)

Her primary impediments to employment are physical.  (*Id.* at 36.)  Her only surgery occurred in 2009, and did not resolve her problems.  (*Id.*)  After the surgery, she underwent numerous sessions of PT and multiple neck injections.  (*Id.* at 36-37.)  The current treatment for her neck is through GNS, and she receives cervical injections and pain medications.  (*Id.* at 37.)  Her current medications are Piroxicam, Diazepam, Kadian, Hydromorphone, Zanaflex, and Lexapro.  (*Id.*)

According to plaintiff, she has neck pain daily, occurring from the top of the neck into the thoracic spine, trapezius muscle, and shoulders.  (*Id.*)  The pain is bilateral from her shoulders into the elbows.  (*Id.*)  Neck movement is painful.  (*Id.* at 37-38.)  She suffers neck stiffness and spasms immediately in the morning having an intensity of 6/10 or 7/10, which medication improves.  (*Id.* at 38-39.)  At times, she needs to rest in the afternoon due to exhaustion.  (*Id.* at 39.)

Plaintiff feels her condition has worsened despite surgery and other treatments.

---

[13] Plaintiff worked part-time from late 2010 to mid-2011 as a school bus driver.  (*Id.* at 34-35.)  Her pain, however, severely affected her concentration, resulting in three accidents.  (*Id.* at 35.)  She reported crying after work due to pain.  (*Id.*)  Plaintiff did not take her pain medication while working.  (*Id.* at 51.)  This position involved working no more than 40 hours per month, for a monthly income of $720.  (*Id.* at 50.)  The work was intermittent.  (*Id.* at 50-51.)

[14] Plaintiff also occasionally does "odd job[s]," such as house sitting, but no more than once or twice per year.  (*Id.* at 35.)

(*Id.*)  Certain activities, including mopping and vacuuming, cause severe pain.  (*Id.* at 51.)  She wanted to train for a long-distance bicycle race, but it was contraindicated by the physical therapist.  (*Id.*)  Plaintiff also suffers from numbness in her shoulders radiating to her elbows.  (*Id.*)  She sometimes awakens during the night to "excruciating" pain and numbness in the arms.  (*Id.* at 51-52.)  Plaintiff described the various non-medical/pharmaceutical approaches for pain management, including massagers, a heating pad, cold pack, special pillows, and a TENS unit.[15]  (*Id.* at 52.)  She has significant difficulty with reaching, which she is trying to improve through PT.  (*Id.* at 52-53.)  Plaintiff has difficulty opening doors.  (*Id.* at 53.)  She is frequently tired, and constant pain contributes to her exhaustion.  (*Id.* at 53-54.)

Plaintiff claims she suffers from PTSD as a result of "a childhood of abuses[,]" for which she receives weekly counseling, and takes Lexapro, that causes tiredness.  (*Id.* at 39.)  She confirmed no recent treatment with a psychiatrist, and weekly counseling helps manage the PTSD.  (*Id.* at 40.)

Plaintiff is currently undergoing PT for her left shoulder, which began in February 2012.  (*Id.* at 40-41.)  Her orthopedic specialist, Dr. Palma, ordered PT after reviewing the MRI results.[16]  (*Id.*)  She feels the PT helps.  (*Id.* at 41.)  She also suffers from arthritis in her left knee and stiffness in both knees, which makes managing stairs difficult.  (*Id.*)  The only treatment for her knees has been PT.  (*Id.* at 41-42.)  Her knee conditions are unrelated to the motorcycle accident.  (*Id.*)

---

[15] Plaintiff's sister helps attach the leads for the TENS unit.  (*Id.* at 52.)
[16] The MRI reported nothing wrong with plaintiff's left shoulder; Dr. Palma disagreed and ordered PT.  (*Id.*)

Plaintiff claims she suffers from Reynaud's syndrome,[17] but admittedly has not been diagnosed with this condition.  (D.I. 14 at 42.)  She described poor circulation in her fingers, primarily in cold weather, causing numbness, tingling, and pain.  (*Id.* at 42, 44.)[18]  She treats her symptoms by exposing her fingers to a heat source, such as a heating pad or a cup of hot water.  (*Id.* at 42-43.)  Numbness and pain returns unless she constantly keeps her fingers warm, for example, by wearing gloves.  (*Id.* at 44.)  Poor circulation did not interfere with holding objects or writing for short periods of time, but can make writing for long periods of time and opening doors difficult.[19]  (*Id.* at 43-44.)

Plaintiff claims her medications cause numerous side effects, including constipation, loss of bowel control, slurred speech, sleepiness, loss of concentration, dry mouth, thirst, and forgetfulness.[20]  (*Id.* at 44-45.)  She walks infrequently, can sit for 15 minutes at a time, and cannot lift more than five pounds, but she can bend at the waist, kneel, and stoop to the floor, albeit slowly.  (*Id.* at 45-46.)  Her sleep is erratic, and limited to four hours.  (*Id.* at 46-47.)

Plaintiff performs most basic hygiene activities by herself,[21] but occasionally

---

[17] Reynaud's syndrome is "a vascular disease of the distal extremities of the fingers, making one's hands intolerable to cold and resulting in decreased blood circulation to the fingertips and loss of sensation[.]"  *Klay v. AXA Equitable Life Ins. Co.*, C.A. No. 09–12, 2010 WL 3885117, at *4 (W.D. Pa. Sept. 28, 2010).

[18] Plaintiff notes it is "hard to move around" in cold weather, and that cold, rainy weather is "immobilizing."  (*Id.* at 53.)

[19] Plaintiff also claims her left shoulder pain makes driving difficult.  (*Id.* at 43-44.)

[20] As to forgetfulness, plaintiff related that she lost two credit cards and went to the wrong doctor for an appointment.  (*Id.* at 46.)

[21] Plaintiff uses a shower chair to bathe; she cannot lift herself out of a tub.  (*Id.* at 47.)

needs help from her sister with dressing.  (*Id.* at 47.)  She reported difficulty changing clothes, stating she will wear the same outfit multiple days or sleeps in her clothing.  (*Id.* at 50.)  She cooks simple "crock pot" meals about every two weeks, can use a microwave, and makes sandwiches.  (*Id.* at 47)  She does laundry, makes her bed, and dusts infrequently.  (*Id.* at 47-48).  She is unable to engage in any hobbies because of her conditions.  (*Id.* at 48.)

Plaintiff prefers not to drive,[22] and does not shop.  (*Id.* at 48.)  She admitted traveling to Pennsylvania in May 2010 to visit friends, but does not travel long distances.  (*Id.* at 49.)  She attends church once a week if possible.  (*Id.*)

## 2.    The Vocational Expert's Testimony

Jenkins testified about plaintiff's background, skills, and limitations, and the kinds of jobs available that a person with her limitations may perform.  (*Id.* at 54-59.)  Plaintiff's past relevant work history was as a price scanner in a department store,[23] school bus driver,[24] hotel auditor,[25] a nursing assistant,[26] customer service clerk,[27] general office clerk,[28] and payment clerk.[29]  (*Id.* at 54-55.)

Jenkins opined plaintiff could transfer clerical skills from her previous jobs, such as those related to using computers, phones, and office machinery, to a job with less

---

[22] Plaintiff replaced the motorcycle totaled in the 2007 accident.  (*Id.* at 33, 48-49.)  In 2010, she burned her leg while riding this vehicle.  (*Id.* at 48-49.)  The motorcycle was sold in 2012, because she had difficulty riding it.  (*Id.* at 49.)
[23] This job was semiskilled and required light exertion.  (*Id.* at 54-55.)
[24] Semiskilled job with medium exertion.  (*Id.* at 55.)
[25] Skilled position and sedentary exertion.  (*Id.*)
[26] Semiskilled work with medium exertion.  (*Id.*)
[27] Unskilled job and light exertion.  (*Id.*)
[28] Unskilled position with light exertion.  (*Id.*)
[29] Semiskilled work and sedentary exertion.  (*Id.*)

exertion.  (*Id.* at 55.)

The ALJ posed the following hypothetical situation:  the individual had the same age and educational background, and all of plaintiff's symptoms and limitations.  (*Id.*) The individual was to avoid pushing, pulling, and reaching overhead, climbing, and concentrated exposure to extreme cold, vibration, moving machinery, and heights.  (*Id.* at 55-56.)  In response, Jenkins testified that individual could perform the jobs of general office, customer service, or payment clerk, and also hotel auditor.  (*Id.* at 56.) All of these jobs, except for payment clerk. permit the individual to sit or stand as is required.[30]  (*Id.* at 57.)  None require bending.  (*Id.*)

When the questionnaire by GNS was presented to Jenkins, she concluded plaintiff was incapable of substantial gainful activity, because her employment was limited to four hours per day and absences would occur more than four days per month. (*Id.* at 58-59.)

**C.    The ALJ's Findings**

Based on the medical evidence and testimony of plaintiff and the vocational expert, the ALJ determined plaintiff was not disabled and, therefore, ineligible for DIB. (*Id.* at 7-20.)  The ALJ's findings are summarized as follows:

>    1.    The claimant meets the insured status requirements
>          of the Social Security Act through June 30, 2014.
>
>    2.    The claimant has not engaged in substantial gainful
>          activity since June 30, 2009, the alleged onset date

---

[30] A payment clerk cannot sit or stand at will because the individual is on public display.  (*Id.* at 57.)  Sitting and standing at will is possible for the general office clerk and customer service clerk positions if they are permitted to wear a phone headset. (*Id.*)

(20 C.F.R. 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: cervical degenerative disc disease with spondylosis, chronic pain syndrome, and bilateral knee pain (20 C.F.R. 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except should avoid pushing and pulling with the arms and working overhead; posturals are all occasional but no climbing of a ladder, rope, or scaffold; avoid concentrated exposure to cold, vibration, and hazards, hazards defined as moving machinery and heights; and handling, fingering, and feeling limited to frequent but not constant.

6.     The claimant is capable of performing past relevant work as a general office clerk; customer service clerk; payment clerk; and hotel auditor.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2009, through the date of this decision (20 C.F.R. 404.1520(f)).

(D.I. 14 at 12-15, 19-20.)

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties moved for summary judgment.  In determining the appropriateness

of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

This standard does not change merely because there are cross-motions for summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

## B.     Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not include substantial evidence to support the ALJ's decision. The Commissioner's factual decisions are upheld if supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr.*

*v. Heckle*, 806 F.2d 1185, 1190 (3d Cir. 1986). Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the decision nor re-weigh the evidence of record. *Monsour*, 806 F.2d at 1190. The court's review is limited to the evidence that was actually presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the court would have decided the case differently, it must defer to and affirm the ALJ so long as the decision is supported by substantial evidence. *Monsour*, 806 F.2d at 1190-91.

Where review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision. *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).

In *Sec. & Exch. Comm'n v. Chenery Corp.*, the United States Supreme Court found that

a "reviewing court, in dealing with a determination or judgment which an administrative

agency alone is authorized to make, must judge the propriety of such action solely by

the grounds invoked by the agency." 332 U.S. 194, 196 (1947). "If those grounds are

inadequate or improper, the court is powerless to affirm the administrative action by

substituting what it considers to be a more adequate or proper basis." *Id.* The Third

Circuit has recognized the applicability of this finding in the social security disability

context. *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001). This court's review

is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F. Supp. 2d

486, 491 (W.D. Pa. 2005). In social security cases, the substantial evidence standard

applies to motions for summary judgment brought pursuant to FED. R. CIV. P. 56(c).

*See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d

Cir. 1988).

## IV. DISCUSSION

In her appeal, plaintiff contends the ALJ's decision to give GNS's opinion little

weight was not supported by substantial evidence. (D.I. 24 at 1.) She further maintains

the ALJ erred in properly developing the record, and in determining her mental

impairments as non-severe. (*Id.* at 1-2.) Finally, plaintiff claims the ALJ relied on

inaccurate vocational expert testimony showing she could perform past relevant work,

because it was inconsistent with the Dictionary of Occupational Titles ("DOT") and

Selected Characteristics of Occupations ("SCO"). (*Id.* at 2.) The Commissioner

maintains the ALJ properly gave little weight to GNS's opinion, as this opinion was not

supported by other evidence in the record.  (D.I. 28 at 1-2.)  She further states the ALJ adequately developed the record as to plaintiff's mental health, and that plaintiff's past relevant work was consistent with the SCO.  (*Id.* at 16-18.)

### A.    Disability Analysis

Title II of the Social Security Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."  *Bowen*, 482 U.S. at 140.  In order to qualify for DIB, the claimant must establish disability prior to the date she was last insured. *See* 20 C.F.R. § 404.131.  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §§ 423(d)(l)(A), 1382(c)(a)(3).  To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  If a finding of disability or non-disability can be made at any point in the sequential process, the review ends.  20 C.F.R. § 404.1520(a)(4).  At the first step, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity, and if so, a finding of non-disabled is required.  20 C.F.R. § 404.1520(a)(4)(I).  If the claimant is not so engaged,

step two requires the Commissioner to determine whether the claimant is suffering from an impairment or a combination of impairments that is severe. If no severe impairment or a combination thereof exists, a finding of non-disabled is required. 20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares them to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *see also Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. 20 C.F.R. § 404.1520(e). At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [his] impairment(s)." *Fargnoli*, 247 F.3d at 40. "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude adjusting to any other available work. 20 C.F.R. § 404.1520(g); *see also Plummer*, 186 F.3d at 427-28. At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work

experience, and RFC before denying disability benefits. *Plummer*, 186 F.3d at 427-28. In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments and often seeks the assistance of a vocational expert. *Id.*

## 1. Weight Accorded GNS

Plaintiff asserts the ALJ erred by failing to give the GNS questionnaire appropriate weight. (D.I. 24 at 8.) A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Such reports will be afforded controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on record. *Fargnoli*, 247 F.3d at 43.

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled. *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429). It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record. SSR 96-2p. If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429. Further, medical testimony from a physician who has never examined the

claimant should not be given credit if it contradicts the testimony of the claimant's treating physician. *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986.)

If not affording a physician's report controlling weight, the ALJ must examine multiple factors. 20 C.F.R. § 404.1527(c). These factors are the "[e]xamining relationship[,] . . . [t]reatment relationship . . . [including the l]ength of the treatment relationship and the frequency of examination. . . [and the n]ature and extent of the treatment relationship[,] . . . [s]upportability . . . [of] relevant evidence to support an opinion[,] . . . [c]onsistency[, and] . . . [s]pecialization." *Id.* An ALJ must weigh the evidence before her. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000). Failure of an ALJ to examine and elaborate on these factors is grounds for remand. *Solomon v. Colvin*, C.A. No. 12–1406–RGA–MPT, 2013 WL 5720302, at *12 (D. Del. Oct. 22, 2013).

Here, the ALJ did not give proper weight to GNS's findings. The ALJ gave diminished weight to its findings because it purportedly failed to contain any "objective medical testing or clinical correlation to support the assessed limitations," while "a majority of the record indicates good cervical spine range of motion and a stable condition post-operatively." (D.I. 14 at 19.) GNS determined plaintiff suffered from failed surgical neck syndrome and "bilateral neck pain radiating to arms and back" with an intensity of 8/10. (*Id.* at 683.) It found a poor prognosis and listed numerous restrictions on plaintiff's abilities to sit, stand, lift, and move different parts of her body. (*Id.* at 683-86.)

In determining the weight afforded to the GNS questionnaire, the ALJ noted plaintiff's improvement following the 2009 surgery. (*Id.* at 15-19.) Most of the

22

improvement, however, was limited to 2009 and 2010.  (*Id.*)  By 2011, plaintiff was complaining to GNS of "continued neck pain[,]" and by February 2012, GNS diagnosed bilateral C6 radiculopathy through an EMG and "concluded . . . [plaintiff] remains totally and permanently disabled from gainful employment."  (*Id.* at 17, 676-77.)  The ALJ also gave "great weight" to the reports of the State agency medical consultants, Drs. Borek and Aldridge, who had never examined plaintiff.  (*Id.* at 18-19, 309-14, 396.)  These reports, however, were from September 2010 and March 2011, and thus were issued before plaintiff's diagnoses by GNS of failed surgical back syndrome in November 2011 and bilateral C6 radiculopathy in February 2012.  (*Id.* at 314, 396, 487, 676.)  As these reports contradict the GNS questionnaire,[31] it was error for the ALJ to accord them great weight.  (*Id.* at 18); *Dorf*, 794 F.2d at 901.

While the ALJ acknowledged the factors in § 404.1527(c) must be examined, she failed to do so in her opinion.  (D.I. 14 at 19.)  GNS had an continuing treatment relationship with plaintiff.  (*See, e.g.*, *id.* at 271-72.)  Plaintiff's treatment relationship with GNS began in May 2010 and entailed frequent visits over a 21-month period.  (*See id.* at 271-72, 677.)  GNS provided extensive treatment to plaintiff for her pain, including lidocaine injections, cervical facet injections, and numerous prescriptions.  (*Id.* at 272, 315, 489-90, 496-97, 505, 507).  GNS also performed numerous examinations on plaintiff, including a neurological examination, palpation of trigger points, physical examinations, X-rays of the cervical spine, and an EMG.  (*Id.* at 272, 315, 487, 491,

---

[31] The reports say plaintiff has "occasional postural limitations" and is only unable to climb "a ladder, rope or scaffold," while the GNS questionnaire says plaintiff will need to change positions every 15 minutes and cannot climb at all.  (*Compare* D.I. 14 at 18 *with* D.I. 14 at 684, 686.)

494-95, 498-500, 505, 507, 676-77.)  The record evidence led GNS to diagnoses of failed surgical neck syndrome and bilateral C6 radiculopathy.  (*Id.* at 487, 676.)  GNS's records consistently show plaintiff suffers from high intensity cervical spine pain and muscle spasm.  (*Id.* at 272, 315, 487, 505, 678, 683.)  GNS specializes in pain management, and its physicians are board certified in pain medicine.  (*E.g.*, *id.* at 505.)  Since the ALJ failed to consider these various factors, the appropriate weight afforded to GNS, a group of treating physicians, should be remanded for the ALJ to consider and elaborate upon the factors of 20 C.F.R. § 404.1527(c).  *Solomon,* 2013 WL 5720302, at *12.

### 2.    Development of Record

Plaintiff claims the ALJ inadequately developed the record as to her mental health issues.  (D.I. 24 at 14-18.)  An ALJ must "develop evidence regarding the possibility of a medically determinable mental impairment" if there is "information to suggest that such an impairment exists, and [the claimant] allege[s] pain or other symptoms but the medical signs and laboratory findings do not substantiate any physical impairment(s) capable of producing the pain or other symptoms."  20 C.F.R. § 404.1529(b).  If the record provides sufficient evidence for an ALJ to determine the severity of a claimant's impairment, however, no further evidence, including "the assistance of a qualified psychiatrist or psychologist[,]" is required.  *See* 20 C.F.R. § 404.1517; *Plummer*, 186 F.3d at 433.  A finding of "not severe" is warranted when an ALJ "is [ ]able to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities" does not preclude the claimant's past relevant work.  *See* SSR 85-28 (1985), at *4.

Here, the ALJ adequately developed the record as to plaintiff's mental health. Plaintiff's counsel admitted during the hearing that her PTSD with attendant depression and anxiety were not severe, and there were "no treatment records to submit." (D.I. 14 at 13.) The ALJ noted plaintiff's PTSD was being treated through Lexapro and therapy, and she never required inpatient treatment or treatment with a psychiatrist for her condition. (*Id.*)

### 3. Vocational Expert Testimony

Plaintiff contends the ALJ erred in relying on the vocational expert's testimony stating a hypothetical person with her limitations could perform some of plaintiff's past relevant work. (D.I. 24 at 18-20.) If a vocational expert fails to understand an ALJ's limitation in a hypothetical and subsequently confirms a claimant may perform jobs that would be precluded by the limitation, the issue must be remanded for clarification. *Burns v. Barnhart*, 312 F.3d 113, 128 (3d Cir. 2002.)

Here, the vocational expert did misunderstand the ALJ's limitation in the hypothetical, specifically, the limitation on overhead reaching.[32] (D.I. 14 at 55.) Despite this limitation, the vocational expert concluded the hypothetical individual could perform jobs involving frequent overhead reaching. (*Id.* at 19-20.) In reliance on the vocational expert's testimony, the ALJ determined plaintiff could perform the jobs of general office clerk, customer service clerk, payment clerk, and hotel auditor, all which require frequent overhead reaching. (D.I. 14 at 19-20; D.I. 24 at 19-20.) As the vocational

---

[32] When presenting the hypothetical, the ALJ said the hypothetical person would have to "in general avoid . . . working overhead with the arms." (D.I. 14 at 55.) This limitation is consistent with the GNS questionnaire, which stated plaintiff could reach (including overhead) for no more than 15% of an eight-hour workday. (*Id.* at 686.)

expert misunderstood the ALJ's hypothetical, the issue should be remanded for clarification. *Burns*, 312 F.3d at 128.

## V.    ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, it is recommended that:

(1) Plaintiff's motion for summary judgment (D.I. 23) be GRANTED in part, and remanded for further consideration consistent with this opinion.

(2) Defendant's cross-motion for summary judgment (D.I. 27) be DENIED in part.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: November 13, 2014            /s/  Mary Pat Thynge
                                   UNITED STATES MAGISTRATE JUDGE